## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TIM PETERSON, on Behalf of Himself and All Others Similarly Situated, | **Case No.:** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| LEARFIELD COMMUNICATIONS, LLC, SIDEARM SPORTS, LLC, UNIVERSITY OF NEBRASKA-LINCOLN and UNIVERSITY OF NEBRASKA-LINCOLN d/b/a UNL DEPARTMENT OF ATHLETICS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Tim Peterson ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against defendants Learfield Communications, LLC, Sidearm Sports, LLC (the "Operator Defendants"), University of Nebraska – Lincoln, and University of Nebraska – Lincoln d/b/a UNL Department of Athletics ("UNL Defendants") (collectively the "Team" or "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of all persons who subscribed to https://huskers.com/ (the "Team Website") operated by or based on Defendants' guidelines, coding, and content.

2.      The Team Website provides users with access to video content related to the university's athletics, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more.

3.      On the Team Website, Defendants offer the option for users to subscribe: (i) through ongoing e-newsletters; and (ii) through signing up for ticket purchasing accounts. Newsletter subscribers are given email updates regarding the Team and content on the Team Website in exchange for their contact information.  The newsletter email updates include links to the Team Website, which contains articles and videos.

4.      Defendants do not disclose on the Team Website that subscribers' personal identifying information ("PII") would be captured by the Facebook Pixel utilized by Defendants (referred to as the "Pixel," discussed and defined herein), and then transferred to Facebook thereby exposing the subscribers' PII to any person of ordinary technical skill who received that data.

5.      Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

6.      Congress has recognized the immediate and irreversible harm caused by associating a person's personally identifiable information in conjunction with their video watching.

7.      The Video Privacy Protection Act ("VPPA"), prohibits video tape service providers,[1] such as Defendants, from sharing PII tied to the title, description, or subject matter of pre-recorded audio video material[2] (the "Video Watching Data") without valid consent.[3]

---

[1] 18 U.S.C. § 2710(a)(4).
[2] 18 U.S.C. § 2710(b)(2)(D)(II).
[3] 18 U.S.C. § 2710.

8.      Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

9.      Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Website and discloses that information to Facebook to gather valuable marketing data.  The Pixel cannot be placed on a Team Website without steps taken directly by Defendants or on behalf of Defendants (*e.g.*, by a website manager).  The Pixel cannot be placed on the Team Website by Facebook without the knowledge and cooperation by Defendants.

10.      Defendants do not seek and have not obtained consent from users or subscribers to utilize the Pixel to track, share, and exchange their PII and Video Watching Data with Facebook.

11.      Defendants knew that their Pixel resulted in users' PII and Video Watching Data being shared (resulting in VPPA violations), and that they failed to obtain users' consent to allow their Pixel to operate in a way that shares users' protected information with Facebook.

12.      Subscribers of the Team Website have been harmed as a result of Defendants' violations of the VPPA.  In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Team Website, or (ii) add, and obtain, the appropriate consent from subscribers.

13.      Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiff seeks relief in this action individually and on behalf of subscribers of the Team Website for violations of the VPPA, 18 U.S.C. § 2710.

14.      Defendants violated the VPPA the moment, and each time, Plaintiff and class members requested, obtained, or watched a video on the Team Website and had their PII shared.

## PARTIES

15.     Plaintiff Tim Peterson is a resident of Colorado.  In or around the year 2016, Mr. Peterson subscribed to Nebraska Cornhuskers' newsletters.  During the sign-up process, Mr. Peterson was not offered or asked for consent to share his information as a result of, or through, Defendants' Pixel.  Mr. Peterson watched pre-recorded video content on the Team Website using a device that was signed into Facebook, as recently as December 2022, resulting Mr. Peterson's PII and Video Watching Data being shared with Facebook.  Mr. Peterson recalls watching many of the Nebraska Football Press conferences on the Team Website since 2016 and most recently recalls watching each of the conferences with the firing of Scott Frost and then the introduction of the new head coach Matt Rhule.  Mr. Peterson recalls watching approximately 3-4 videos a month on the Team Website since 2016. Mr. Peterson's Facebook profile included personally identifiable information.  On March 3, 2023 Mr. Peterson served Defendants with pre-suit notice of the VPPA violations alleged herein. Mr. Peterson would continue or resume using the site should the offending tracking tools be removed or rendered inactive. *See infra* para. 58-59.

16.     Defendant Learfield Communications, LLC ("Learfield") was formed in the state of Delaware and is a collegiate sports marketing company with headquarters at 2400 Dallas Parkway, Suite 500 Plano, Texas 75093. Learfield works to connect companies, including Fortune 500 businesses and Interbrand's brands, to fans.  It "provide[s] solutions to [its] partners that include multimedia rights representation, licensing, broadcasting, ticketing, digital solutions, seat sales, in-venue technology, data and brand management, on-location signage,

hospitality, and social media."[4]  Defendant Learfield can be served by serving its registered agent, C T Corporation System, 5601 South 59th Street, Suite C, Lincoln, Nebraska 68516.

17.     Defendant Sidearm Sports, LLC ("Sidearm Sports") was formed in the state of Missouri with headquarters at 109 S. Warren Street, Suite 600, Syracuse, New York 13202 and an office shared with Learfield at 2400 Dallas Parkway, Suite 500, Plano, Texas 75093. Sidearm Sports provides "official websites, mobile apps, live streaming, stats and more" for "the biggest brands in sports."[5]  In 2014, Learfield purchased Sidearm Sports. Sidearm Sports manages websites and mobile platforms, as well as provide the hosting and infrastructure, for colleges and high schools.[6]  Sidearm Sports and Learfield (collectively "Operator Defendants") packaged their services and offered them to prospective partners, including numerous colleges' sports team websites.[7] Sidearm Sports can be served by serving its registered agent in the state of Missouri, C T Corporation System, 120 South Central Avenue, Clayton, Missouri 63105 or its registered agent in the state of New York, C T Corporation System, 28 Liberty Street, New York, New York 10005.

18.     Defendant University of Nebraska – Lincoln ("UNL") is a Nebraska public university and member of the University of Nebraska System with its principal place of business in Lincoln, Nebraska.  Defendant UNL operates and promotes an institution of higher learning and its associated collegiate sports teams, including through the development of websites and mobile apps.

---

[4] *Working at LEARFIELD*, LEARFIELD, *available at* https://www.learfield.com/working-at-learfield/ (last visited on April 2, 2023).
[5] *About Us: SIDEARM 101*, SIDEARMSPORTS, *available at* https://sidearmsports.com/history (last visited on April 2, 2023).
[6] *CBS Interactive Advanced Media, Learfield's Sidearm Sports Partners in College Sports*, SVG NEWS, *available at* https://staging.sportsvideo.org/2018/02/12/cbs-interactive-advanced-media-and-learfields-sidearm-sports-to-partner-in-college-sports/ (last visited on April 2, 2023).
[7] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD, *available at* https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on April 2, 2023).

19.     Defendant University of Nebraska – Lincoln d/b/a UNL Department of Athletics ("Cornhuskers" or "Huskers") is headquartered in Lincoln, Nebraska.  Defendant Cornhuskers administers UNL's athletics programs.  The Cornhuskers offers guests of the site the option to sign-up for a team newsletter.  The Team Website also offers a selection of viewable media, including pre-recorded videos.  The Team Website has utilized Pixel that allows the Team to transmit subscribers' identifiable information, without the consent of subscriber-users, from the Team Website to Facebook.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

21.     This Court has personal jurisdiction over Defendants because Defendants' principal places of business are all in the state of Nebraska, and Operator Defendants derive revenue in the State of Nebraska from its management and operational control over the Cornhuskers Website, as well as the revenue sharing, advertising sales, etc. that the Operator Defendants derive from the Cornhuskers Website.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because UNL Defendants' principal place of business is located in this District and all Defendants conduct substantial business operations in this District. In connection with the Team Website, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendants' business operations in this District.

## COMMON FACTUAL ALLEGATIONS

### A.  Background of the Video Privacy Protection Act

23.   The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

24.   The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase, and viewing data.

25.   In 1988, Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio-visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

26.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

27.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[8]

28.     Defendants here are video service providers in that they provided pre-recorded audio-visual materials to Plaintiff and Class members on their Team Website.

29.     The relationship between Plaintiff and Defendants is precisely the type of relationship contemplated by the VPPA.

30.     In this case, Defendants knowingly and systematically disclosed Plaintiff's personal viewing information to Facebook, without obtaining their consent, by purposely placing the Pixel on the Team Website with the knowledge it would collect user information.

---

[8] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on April 2, 2023).

**B.**     **The Team Website is Managed by Operator Defendants**

     **a.**  **UNL Defendants granted authority over the Team Website to the Operator Defendants**

31.     Learfield is a collegiate sports marketing company with headquarters at 2400 Dallas Parkway, Suite 500 Plano, Texas 75093. Learfield represents more than 200 of the nation's top collegiate properties including the NCAA and its 89 championships, NCAA Football, leading conferences, and many of the most prestigious colleges and universities in the country.[9]

32.     Sidearm Sports is a provider of collegiate athletic web solutions with headquarters at 109 Warren Street, Suite 600, Syracuse, New York 13202. It manages websites and mobile platforms, as well as provide the hosting and infrastructure, for colleges and high schools.[10]

33.     In 2014, Sidearm Sports was purchased by Learfield,[11] which packaged their services and offered them to prospective partners, including numerous colleges' sports team websites.[12]  Sidearm Sports and Learfield jointly implemented their web-based solutions for college teams, cooperatively providing services ranging from digital marketing and web development to intellectual property rights service associated with partner schools' websites (referred to collectively as "Web Services").[13]

---

[9] *Learfield – IMG College*, LADDERS, *available at* https://www.theladders.com/company/learfield-img-college-jobs (last visited on April 2, 2023).

[10] *CBS Interactive Advanced Media, Learfield's Sidearm Sports Partners in College Sports*, SVG NEWS, *available at* https://staging.sportsvideo.org/2018/02/12/cbs-interactive-advanced-media-and-learfields-sidearm-sports-to-partner-in-college-sports/ (last visited on April 2, 2023).

[11] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD, *available at* https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on April 2, 2023).

[12] *Id.*

[13] *Working at LEARFIELD*, LEARFIELD, *available at* https://www.learfield.com/working-at-learfield/ (last visited on April 2, 2023).

34.     Operator Defendants' Web Services are used for college sports websites across the nation.   Operator Defendants runs and operates the websites of 1,100 college and universities,[14] including 300 of the 320 schools in Division 1 Sports.[15]

35.     Operator Defendants tout that they are a "trusted provider of official websites, mobile apps, live streaming, stats and more [for college teams]."[16] Operator Defendants "offer[] [their] clients an easy-to-use interface" which includes "content streams and digital presence."[17]

36.     Operator Defendants also offer turn-key Web Services to colleges allowing college teams to select from pre-designed websites, which they describe as "plug and play."[18] Operator Defendants, in effect, assume the license for the colleges' name and intellectual property for matters pertaining to the college websites.[19]

37.     Operator Defendants offer a "streaming platform [that] deploys an original solution where fans [are] able to find live, original and pre-recorded content all in one central location."[20] Operator Defendants state that their "[s]treaming [platform] is our single most opted in product for our partners."[21]

---

[14] *Sidearm Sports, which runs 1,100 college websites from Syracuse, makes big move*, SYRACUSE.COM, *available at* https://www.syracuse.com/business-news/2018/09/sidearm_sports_which_runs_1100_college_websites_from_syracuse_makes_big_move.html#:~:text=Eighteen%20years%20later%2C%20his%20company,schools%20in%20Division%201%20sports (last visited on April 2, 2023).

[15] Work at SIDEARM: Openings, SidearmSports, *available at* https://sidearmsports.com/openings?gh_jid=5533939003 (last visited on April 2, 2023).

[16] *About Us: SIDEARM 101*, SIDEARMSPORTS, *available at* https://sidearmsports.com/history (last visited on April 2, 2023).

[17] *Learfield Sports to Acquire Sidearm Sports*, LEARFIELD, *available at* https://www.learfield.com/2014/06/learfield-sports-to-acquire-sidearm-sports-2 (last visited on April 2, 2023).

[18] *Our Services: Turn-Key Websites*, SIDEARMSPORTS, *available at* https://sidearmsports.com/turnkey/ (last visited on April 2, 2023).

[19] *Id.*

[20] *Our Services: SIDEARM Streaming*, SIDEARM SPORTS, *available at* https://sidearmsports.com/streaming/ (last visited on April 2, 2023).

[21] *Id.*

10

38.     In 2018, Learfield announced a partnership with CBS Interactive Advanced Media to produce and operate more than 1,100 college and high school athletic websites, with streaming of more than 14,000 live events each year.[22]

39.     Colleges that have used Operator Defendants' Web Services have noted that using Operator Defendants "[offers] more revenue generation opportunities."[23]

40.     One public university website described Operator Defendants' Web Services to include the integration of "records on [their] home page to display a snapshot of each team's performance, a social media wall that integrates engaging content onto the website, and embedded videos and photo galleries to aid in storytelling through a visual medium."[24]

41.     As part of an announced website redesign using Operator Defendants Web Services, a private university stated that Operator Defendants "will manage the website and mobile platforms while providing the hosting and infrastructure for all of the schools."[25]

42.     Another private school announced their partnership with Operator Defendants in 2019 stating that "Sidearm Streaming will provide an All-Access homepage for video **content**, which will house live webcasts, **archived game content**, highlights, features, and interviews with players and coaches."[26]

43.     With respect to ownership rights, Operator Defendants' contracts state that:

---

[22] CBS Interactive Advanced Media and Learfield's Sidearm Sports to Partner in College Sports, LEARFIELD, *available at* https://www.learfield.com/2018/02/cbs-interactive-advanced-media-learfields-sidearm-sports-partner-college-sports/ (last visited on April 2, 2023).
[23] *See, e.g.*, *YSU Athletics Joins SIDEARM Sports Family*, YOUNGSTOWN STATE UNIVERSITY SPORTS, *available at* https://ysusports.com/news/2022/5/17/general-ysu-athletics-joins-sidearm-sports-family.aspx (last visited on April 2, 2023).
[24] *A New Era of CSUSBAthletics.com*, CAL STATE SAN BERNADINO ATHLETICS, *available at* https://csusbathletics.com/news/2022/12/14/general-a-new-era-of-csusbathletics-com.aspx (last visited on April 2, 2023).
[25] *LMU Athletics Launches Website Redesign with SIDEARM Sports*, LOYOLA MARYMOUNT UNIVERSITY ATHLETICS, *available at* https://lmulions.com/news/2018/8/1/baseball-lmu-athletics-launches-website-redesign-with-sidearm-sports (last visited on April 2, 2023).
[26] *King's Athletics Partners With SideArm Streaming, BlueFrame Technology*, KINGS COLLEGE ATHLETICS, *available at* https://kingscollegeathletics.com/news/2019/8/2/general-kings-athletics-partners-with-sidearm-streaming-blueframe-technology.aspx (last visited on April 2, 2023).

*b. Scope of Relationship between College Teams and Sidearm*

Sidearm shall be the owner of the [Web Services] and any and all intellectual property rights therein contained (including but not limited to all patents, trademarks, know how, and business models), and, in further consideration for the rights granted herein to Client, Client hereby assigns to SIDEARM any and all rights, title and interest, including, without limitation, patents, copyrights, trade secrets and proprietary rights, in and to the materials created or developed by SIDEARM hereunder and required to be delivered to Client in connection with the Service (the "Deliverables"). The Deliverables shall not be deemed to be "works made for hire" under the U.S. (or any other jurisdiction's) copyright laws. Client agrees to give SIDEARM reasonable assistance to perfect such assignment of such rights, title and interest. Client will not and will not allow others to reverse engineer, decompile, disassemble or otherwise attempt to derive the source code of any SIDEARM Service or Deliverable, except to the extent allowed under any applicable law.[27]

44.     Operator Defendants effectively retain ownership of their Web Services, and require college teams to assign patents, copyrights, trade secrets, and proprietary rights, in connection with materials associated with the Web Services it provides to its partners.

45.     Operator Defendants' Web Services include setup and operation of online service platforms and mobile applications with related functionality.[28] Operator Defendants also provide data storage and general video hosting services for all audio and video files for collegiate clients for a period of twenty-four (24) months.[29]

46.     In addition to the Web Services described above, Operator Defendants provide and manage all of the technical backend and support services to end users, including subscribers, of the Team Website. This includes providing: (a) support representatives via phone, email, or ticketing system; (b) outside of hours 24/7 critical support; (c) software

---

[27] *Triton Regular Meeting of the Board of Trustees* (the "Triton Agreement"), page 39-40, paragraph 8, *available at* https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on April 2, 2023); *see also Sidearm Sports Renewal for Texas A&M University – Commerce* (the "Texas A&M Renewal Agreement"), p. 13 of 16, paragraph 6.2, *available at* https://appsprod.tamuc.edu/contracttransparency/ViewDoc.ashx?I=694&T=P (last visited on April 2, 2023).

[28] Triton Agreement, at page 39/78, paragraph 3, *available at* https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf (last visited on April 2, 2023).

[29] *Id.* at page 42/78, paragraph 7.

upgrades at no charge; (d) academic year support hours, normal and after hours; and (e) non-academic year support hours.[30]

47.     In addition to the control Operator Defendants have over the operation, content, and overall management of the college team websites managed through the Operator Defendants' Web Services, Operator Defendants have the ability to unilaterally cut of or shut down college team websites.[31]

48.     Operator Defendants require that the collegiate clients will "allow for display of a 'powered by' Sidearm logo(s) and a link to Sidearm's website, privacy policy and terms of use at the bottom of each page on the Client service," and that "the [Web Services] will be provided in accordance with Sidearm's privacy policy and terms of use (as each may be updated from time to time during the term of this Agreement)."

49.     To highlight the primacy of Operator Defendants' Terms, the collegiate websites that utilize Operator Defendants' Web Services offer links to the Operator Defendants' Terms of Service – and not to the colleges' own terms – on the bottom of the Team Website itself.[32]

50.     Operator Defendants also ensure compliance with the Web Content Accessibility Guidelines (WCAG) 2.0 requirements for all users. [33]

---

[30] *Id.* at page 43/78, paragraph 10.
[31] *See Sidearm Sports Proposal for University of New Mexico*, p. 9 of 18, *available at* https://athleticscontracts.unm.edu/website-agreement/sidearm-sports---website-agreement---2015.pdf ("Failure to pay the fee within 30 days following the due date may result in suspension of Services") (last visited on April 2, 2023); *Texas A&M Renewal Agreement*, p. 11 of 16, https://appsprod.tamuc.edu/contracttransparency/ViewDoc.ashx?I=694&T=P (same) (last visited on April 2, 2023); *Sidearm Sports Proposal for University of Louisiana Lafayette*, p. 17 of 23, https://purchasing.louisiana.edu/sites/purchasing/files/Attachment%20L%20Sidearm%20contract.pdf (same) (last visited on April 2, 2023).
[32] *See, e.g.,* https://floridagators.com/, Terms of Service, linking to https://sidearmsports.com/sports/2022/12/7/terms-of-service (last visited on April 2, 2023); https://huskers.com/, Terms of Service; https://goheels.com/sports/mens-basketball, Terms of Service, linking to https://sidearmsports.com/sports/2022/12/7/terms-of-service (last visited on April 2, 2023).
[33] Web Content Accessibility Guidelines (WCAG) 2 is developed through the W3C process in cooperation with individuals and organizations around the world, with a goal of providing a single shared standard for web content accessibility that meets the needs of individuals, organizations, and governments internationally. *See WCAG 2*

51.     In exchange for Operator Defendants' Web Services, college teams agree to assign all web traffic to Operator Defendants stating:

> Client agrees that the Client's website's traffic (e.g., the amount of data sent and received by Client's website's visitors) will be assigned to Sidearm for purposes of syndicated audience measurement reports, and Client will cooperate with Sidearm to effectuate such purpose, including executing all necessary and/or required assignment documents prepared by companies that provide syndicated audience measurement services.[34]

### b. Operator Defendants exhibit actual control over and management of the Team Websites

52.     Operator Defendants develop, operate, and own the Team Website.  Operator Defendants effectively retain complete control of the Team Website.  Operator Defendants have the ability to lock the client out of the Team Website; Operator Defendants derive revenue from the Team Website through revenue sharing with advertisers; Operator Defendants reserve their own advertising space on the Team Websites; and Operator Defendants set and implement its own code for generating and tracking advertising on the website, user tracking, video hosting, subscription services, and website design.

53.     Operator Defendants consistently uses tracking tools, such as pixels (including Facebook's and its own), Google's suite of tools (including Google Analytics and Doubleclick Floodlight), comScore, and Salesforce DMP.  As described herein, the Facebook Pixel is a toolset that allows websites to track user activity by monitoring for triggered events and sharing that data with Facebook.

54.     Operator Defendants' own pixel (the "Sidearm Pixel") is also used to monitor user activity on the Team Websites.  Among other things, the Sidearm Pixel tracks which

---

*Overview*, W3C Web Accessibility Initiative WAI, *available at* https://www.w3.org/WAI/standards-guidelines/wcag/, (last visited on April 2, 2023).

[34]     Triton     Agreement,     page     42/78,     paragraph     9,     *available     at* https://www.triton.edu/contentassets/789ed52a8e124a4db878cca7e312640a/2022_04_19_boardbook.pdf     (last visited on April 2, 2023).

webpages a user visits, when those webpages were published, and which sport a user interacts with:



*Figure 1 - Sidearm Pixel captures sport, team, webpage location of video[35]*

55.    The Sidearm Pixel also tracks which embedded videos, pre-recorded and streaming, were watched on any given webpage:



*Figure 2 - Sidearm Pixel captures path of and title of embedded video watched by user[36]*

56.    Rather than providing its tracking data to the UNL Defendants, this data is sent to statcollector.sidearmsports.com.   On information and belief, much of the data Operator

---

[35] *Christopulos Named 2023 Big Ten Gymnast of the Year*, NEBRASKA CORNHUSKERS, *available at* https://huskers.com/news/2023/3/28/mens-gymnastics-christopulos-named-2023-big-ten-gymnast-of-the-year.aspx (last visited on April 2, 2023).
[36] *Id.*

Defendants collects from users, from all of its data collection methods, is retained for its own use.

57.     The Operator Defendants are capable, at any time, of ending Defendants' improper sharing of subscribers' PII. The Operator Defendants are capable, at any time, of stopping the employment and use of the Facebook Pixel and other tracking tools. The Operator Defendants are capable, at any time, of ending Defendants' continued and ongoing VPPA violations. In fact, based on investigation performed on Plaintiffs' behalf, the Operator Defendants turned off the Facebook Pixel functionality on at least one of the other college websites it similarly operates and controls and appears to be beginning a shift away from the use of Facebook Pixel as Defendants receive notices of their violations from subscribers.

58.     Operator Defendants also standardize, host, and control the video hosting services and the Team Website's video content. The video hosting for the Team Website, for example, is depicted below in connection with a CBS video:



*Figure 3 – Nebraska Cornhuskers Team Website uses CBS Player to stream video; in this instance, viewed as of March 30, 2023*

59.     As part of its decision-making over sourced video content, Operator Defendants'
use of YouTube is depicted below:



*Figure 4 - Operator Defendants' use of YouTube to host videos; in this instance, viewed as of April 3, 2023*

60.     Despite the existence of dozens of competing content delivery platforms,[37]
tellingly, CBS or YouTube appear on each of the Team Websites managed by Operator
Defendants.

61.     Operator Defendants even manage the advertising for the Team Websites, for
which they carve out their own advertising space and/or share in the revenue of the advertising
on the team site.   Operator Defendants' control over the advertising is highlighted by the
presence of CBS code even where CBS does not host the Team's videos:

---

[37] *See Content Delivery Networks*, CDN PLANET, *available at* https://www.cdnplanet.com/cdns/ (last visited on
April 2, 2023).

```
·  window.client_hostname = "huskers.com";window.client_title = "University of Nebraska";window.server_name = "1129021-LB12";wi
   {"page_template":"home","sport_name":"0","sport_name_custom":"0","site":"nebraska","cbs_site_code":"neb","content_id":null,"
   "nebraska";window.dfp_network_code = "21708449227";window.img_dfp_unit_name = "SAIndependent/nebraskalincoln";window.ad_full
   false;window.reactions = null;window.cbs_ads_activated = true;window.site_colors =
   {"safe_text_white":"#000000","safe_text_black":"#ffffff","primary_background":"#E41C38","primary_text":"#ffffff","secondary_
   = "";window.site_in_dev_mode = false;window.sidearm_header_bidding_enabled = true;
                            window.utagData = function() {
                                return {
                                    embedPageUrl: location.href,
                                    brandPlatformId: "sidearm_site_" + (document.documentElement.clientWidth > 600 ? "desktop" : "mo
                                    pageViewGuid: PageTargetting.getPageviewGuid(),
                                    _pageViewGuid: PageTargetting.getPageviewGuid() // cbs says they need it both /shrug
                                };
                            }; == $0
```

*Figure 5 – Operator Defendants' cause use of CBS tracking on University of Nebraska athletics website; in this instance, viewed as of March 14, 2023*

62.     On information and belief, CBS's continued presence on Team Website does not stem of a relationship between CBS and UNL Defendants, but rather advertising rights it bargained for with Operator Defendants and further indicates Operator Defendants' control over the Team Website's advertising and data management.

63.     The uniformity of the websites designed and operated by Operator Defendants is highly indicative of a copy-paste design stemming from Operator Defendants' control over the Team Website.

**C.**     **Defendants Utilize the Facebook Pixel to Gather and Transmit PII and Video Watching Data**

64.     Facebook offers the Facebook Pixel, also known as the Meta Pixel (the "Pixel"), to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

65.     The Pixel is a marketing tool that must be added by website developers to a website.  A website must link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[38]  Thus, the addition of a Pixel to a website is an affirmative act that must be done purposefully.  The Team went through, or directed its web site developers to go through, these steps to add the Pixel to its website.

66.     A function of the Pixel is to gather, collect, and then share user information with Facebook.[39]  This information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[40]

67.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.

68.     The owner of a website – here, Defendants – holds the decision-making authority over the placement of the Pixel on its site.  The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business.

---

[38] *How to set up and install a Meta Pixel*, FACEBOOK, *available at* https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on April 2, 2023).

[39] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, *available at* https://developers.facebook.com/docs/meta-pixel/ (last visited on April 2, 2023).

[40] *See Meta Pixel*, FACEBOOK, *available at* https://www.facebook.com/business/tools/meta-pixel (last visited on April 2, 2023).

The level of management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

### a. Defendants added the Pixel to the Cornhuskers' Website

69.     To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[41]  For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[42]

70.     The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site.  The website operators name the Pixel.[43]

71.     Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,[44] as well as connect the Pixel to a Facebook Ad account.[45]

---

[41]    *How to create a Meta Pixel in Business Manager*, FACEBOOK, *available at* https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on April 2, 2023).

[42]    Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL, *available at* https://sproutsocial.com/insights/facebook-business-manager/ (last visited on April 2, 2023).

[43]    *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, *available at* https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited April 2, 2023).

[44]    *Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK, *available at* https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on April 2, 2023).

72.     To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

73.     Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[46] (v) domain verification, and (vi) configuring web events.[47]

74.     After following these steps, a website operator can start harvesting information using the Pixel.

75.     A Pixel cannot be placed on a website by a third-party without being given access by the site's owner.  There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

76.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[48]

77.     A Facebook UID can be used, by anyone, to easily identify a Facebook user. Any person, even without in-depth technical expertise, can utilize the UID. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by

---

[45] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited on April 2, 2023).

[46] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on April 2, 2023).

[47] *How to set up and install a Meta Pixel*, FACEBOOK, *available at* https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on April 2, 2023); *see* Ivan Mana, How to Set Up & Install the Facebook Pixel (in 2022), YOUTUBE, *available at* https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on April 2, 2023).

[48] *Cookies & other storage technologies*, FACEBOOK, *available at* https://www.facebook.com/policy/cookies/ (last visited on April 2, 2023).

any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).   That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

### b.    The Pixel as a Tracking Method

78.    The Pixel tracks user-activity on web pages by monitoring events which,[49] when triggered, causes the Pixel to automatically send data directly to Facebook.[50]

79.    Examples of events utilized by websites are: a user loading a page with (i) "microdata" tags (the "Microdata event"),[51] or (ii) with a Pixel installed (the "PageView event").[52]  The Team Website utilize both events.[53]

80.    When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[54]  This confirms that the Pixel events sent data to Facebook.

81.    The HTTP Request includes a Request URL, embedded cookies such as the c_user cookie.  It may also include information in its Payload, such as metadata tags.

---

[49]    *Meta   Business   Help   Center:   About   Meta   Pixel*,   FACEBOOK,   *available   at* https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on April 2, 2023).

[50] *See generally Id.*

[51] *Facebook Microdata Installing Schema*, CAT HOWELL, *available at* https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on April 2, 2023).

[52]    *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK, *available at* https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last   visited   on   April   2, 2023).

[53]    The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See About the Meta Pixel Helper*, FACEBOOK, *available at* https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last   visited   on   April   2, 2023).

[54]    *How We Built a Meta Pixel Inspector*, THE MARKUP, *available at* https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on April 2, 2023).

82.     A Request URL, in addition to a domain name and path, typically contains parameters.  Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 1 – Mozilla's diagram of a URL, including parameters*[55]

### c.   The Pixel Shares Users' PII and Video Watching Data

83.     When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[56]

84.     The parameters for a Request URL, for instance, may include the title of a video being watched or the URL of the video, as depicted below:

```
▼ General
   Request URL: https://www.facebook.com/tr/?id=986058541570288&ev=PageView&dl=https%3A%2F%2Fhuskers.com%2Fshowcase%2Fembed.
   aspx%3FArchive%3D%26youtube%3D%252F%252Fyoutube.com%252Fwatch%253Fv%253D9qzD7-eSWSc%26autoplay%3Dtrue%26controls%3Dtrue%2
   6title%3DNebraska%2BMBB%2BMedia%2BAvailability%2B%257C%2BFeb.%2B7&rl=https%3A%2F%2Fhuskers.com%2Fnews%2F2018%2F4%2F18%2F9
   42193&if=true&ts=1675883890627&sw=1536&sh=864&v=2.9.95&r=stable&ec=0&o=30&cs_est=true&fbp=fb.1.1675883644515.1315335815&i
   t=1675883890466&coo=false&tm=1&rqm=GET
   Request Method: GET
```

*Figure 2 - PageView event firing, including video title and URL of video as parameters of Request URL*[57]

85.     While Microdata events can send data through the parameters, often the Microdata event sends its information through the Payload.

86.     Microdata events are triggered whenever a web page containing Microdata tags is loaded.[58]

---

[55]     *What is a URL?*, MOZILLA, *available at* https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on April 2, 2023).
[56]     *Meta for Developers: Conversion Tracking*, FACEBOOK, *available at* https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited on April 2, 2023).
[57]     *Nebraska Softball Videos*, NEBRASKA CORNHUSKERS https://huskers.com/news/2018/4/18/942193 (last visited March 2, 2023).

87.     Microdata tags allow developers to nest metadata within the contents of a web page.[59]

88.     This metadata may include the title of a video – for example, here, "Sports Nightly Video (6-6:45 PM)" – on the Team's website, as depicted below:



*Figure 3 - Microdata Event sends Microdata tag for video's title to Facebook.[60]*

89.     When a Microdata event fires, it sends a request to Facebook containing data, including, but not limited to, the Microdata tags, as depicted in the developer's console viewing the "Payload" above.

90.     When a "c_user" cookie is in place, both the Microdata and PageView event requests include a user's c_user cookie and copy the c_user cookie into the Request Header, as depicted below:

[58] *Facebook Microdata Installing Schema*, CAT HOWELL, *available at* https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on April 2, 2023).
[59] *Meta for Developers: Microdata Tags*, FACEBOOK, *available at* https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited on April 2, 2023).
[60] *Sports Nightly Video (6-6:45 PM)*, NEBRASKA CORNHUSKERS https://huskers.com/watch/?Archive=3796&type=Archive (last visited March 24, 2023).



*Figure 4 - Embedded c_user cookie in Pixel Request transmitted to Facebook[61][62]*

91.     Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of a user's website interactions (including Video Watching Data) and Facebook UID with Facebook.

92.     Thus PII and Video Watching Data of subscriber-users, including Plaintiff and Class Members, have automatically been shared with Facebook as a result of Team's decision to add the Pixel to the Team Website.

**D.      E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Cornhuskers and Subscribers**

93.     The Cornhuskers benefits from the value created through its use of free e-newsletters and its subscription-based service model.

94.     E-newsletters are an important and effective business tool.  In fact, 31% of business-to-business marketers say that sending e-newsletters is the paramount way to nurture leads.[63]   Additionally, visitors who reach web pages through e-mails, such as e-newsletters,

---

[61] *Nebraska Softball Videos*, NEBRASKA CORNHUSKERS https://huskers.com/news/2018/4/18/942193 (last visited March 2, 2023).
[62] This video was navigated to using the Related Videos function, which cycles out the videos periodically with more recent videos.  It is no longer possible to navigate to this video through this method.
[63]     *What is an Email Newsletter?*, CAMPAIGN MONITOR, *available at* https://www.campaignmonitor.com/resources/knowledge-base/what-is-an-email-newsletter/ (last visited on April 2, 2023).

view more pages per session (2.5 to 1.2), as well as visiting web pages more often than those referred to web pages from Facebook.[64]  Web page visits stemming from e-mails are also more engaged than those from any other platform.[65]  The Cornhuskers, through its interplay between it free newsletters and increasing traffic to its website, recognized and utilized this business tool.

95.     E-newsletters further provide value by creating brand awareness and broaden interest in the organization itself.[66]  The Cornhuskers' newsletter effectively served to provide this value.

**E.     Sign-up for the Defendants' Subscriptions Lack Informed, Written Consent**

96.     The Team Website does not seek nor obtain permission from their subscribers, including Plaintiff and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.

97.     The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent.

98.     To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

99.     The Team Website includes a newsletter sign-up, which appears as:[67]

---

[64]  *Content Monetization: Driving Revenue with Email Newsletters*, UPLAND, *available at* https://uplandsoftware.com/postup/resources/blog/content-monetization-email-newsletters/ (last visited on April 2, 2023).

[65]  *Id.*

[66]  *8 Ways to Monetize Email Newsletters for Publishers*, SAILTHRU, *available at* https://www.sailthru.com/marketing-blog/8-ways-monetize-email-newsletters-publishers/ (last visited on April 2, 2023) (adding that e-newsletters can serve as a means to hook consumers to more frequently subscribe to a paid subscriptions with the company by providing users a taste of what the site's paid content may offer).

[67]  *Sign Up for Newsletter*, NEBRASKA CORNHUSKERS, https://huskers.com/subscribe.aspx?path=athletics (last visited March 23, 2023).



### F. Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's PII and Video Watching Data

100.    The VPPA sets out guidelines as to the forms of consent that consumers can give to video tape service providers to share consumers' information.

101.    The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[68]

102.    Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[69]

103.    While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the

---

[68] 18 U.S.C. § 2710(b)(2)(B); 18 U.S.C. § 2710(b)(2)(B)(i).
[69] 18 U.S.C. § 2710(b)(2)(B)(ii); 18 U.S.C. § 2710(b)(2)(B)(iii).

consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[70]

104.    Plaintiff and Class Members did not consent to Defendants' Pixel pursuant to the VPPA, as Plaintiff was not asked to provide informed, written consent in a form separate from other legal or financial obligations.

105.    Additionally, Plaintiff and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

106.    Finally, Defendants provide titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiff's and Class Members' PII.

## **CLASS ACTION ALLEGATIONS**

107.    Plaintiff brings this action individually and on behalf of the following Class:

> All persons in the United States with a subscription to the Cornhuskers' Website that had their personal information improperly disclosed to Facebook through the use of the Pixel (the "Class").

108.    Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

109.    Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

---

[70] 18 U.S.C. § 2710(b)(2)(D).

110.   This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

111.   Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Team Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

112.   Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, a Team Website to watch videos, and had their PII collected and disclosed by Defendants.

113.   Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Class.   Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

114.   Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein.   If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

115.   Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions

of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      a.   Whether Defendants collected Plaintiff's and the Class's PII and Video Watching Data;

      b.   b. Whether Defendants unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Team Website in violation of the VPPA;

      c.   c. Whether Defendants' disclosures were committed knowingly; and

      d.   d. Whether Defendants disclosed Plaintiff's and the Class's PII and Video Watching Data without consent.

116.    Information concerning Defendants' Team Website data sharing practices and subscription members are available from Defendants' or third-party records.

117.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

118.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

119.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

120.    Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

**COUNT I**

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiff and the Class)**

121.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 120 as though fully set forth herein.

122.    Plaintiff brings this count on behalf of himself and all members of the Class.

123.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

124.    Defendants violated this statute by knowingly disclosing Plaintiff's and other Class members' personally identifiable information to Facebook.

125.    Defendants, through the Team Website, engages in the business of delivering video content to subscribers, including Plaintiff and the other Class members, and other users. The Team Website delivers videos to subscribers, including Plaintiff and the other Class members, by making those materials electronically available to Plaintiff and the other Class members on the Team Website.

126.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

127.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

31

128.    The UNL Defendants and the Operator Defendants are, individually and collectively, "video tape service providers" because they create, host, and deliver hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

129.    Defendants solicit individuals to subscribe to the Team Website newsletters that advertise and promote videos and articles on the Team Website.

130.    Plaintiff and members of the Class are "consumers" because they subscribed to the Team newsletters. 18 U.S.C. § 2710(a)(1).

131.    Plaintiff and the Class members viewed video clips using the Team Website.

132.    Defendants disclosed Plaintiff's and the Class members' personally identifiable information to Facebook. Defendants utilized the Pixel which forced Plaintiff's web browser to transfer Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's event data, like the title of the videos they viewed.

133.    Defendants knowingly disclosed Plaintiff's PII, which is triggered automatically through Defendants' use of the Pixel.  No additional steps on the part of the Defendants, Facebook or any third-party is required.  And, once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

134.    The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed

32

written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

135.    Plaintiff and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.  Defendants failed to obtain "informed, written consent" from subscribers – including Plaintiff and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

136.    Defendants' disclosure of Plaintiff's and Class Members' Video Watching Data and PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

137.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

138.    On behalf of themselves and the Class, Plaintiff seeks: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18

U.S.C. § 2710(c) as to Operator Defendants; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### Injunctive Relief Of Defendants' Ongoing VPPA Violations

139.    An actual and immediate controversy has arisen and now exists between Plaintiff and the putative class he seeks to represent, and Defendants, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendants have violated, and continue to violate, Plaintiff's rights to protection of his PII under the VPPA.

140.    Plaintiff has demonstrated that he is likely to succeed on the merits of  his claims, and is thus, entitled to declaratory and injunctive relief.

141.    Plaintiff- has no adequate remedy at law to stop the continuing violations of the VPPA by Defendants. Unless enjoined by the Court, Defendants will continue to infringe on the privacy rights of Plaintiff and the absent class members and will continue to cause, or allow to be caused, irreparable harm to Plaintiff and the class. Injunctive relief is in the public interest to protect the PII of Plaintiff, and other consumers that would be irreparably harmed through continued disclosure of their PII.

142.    On March 3, 2023, defendant University of Nebraska was formally notified by plaintiff Tim Peterson of its VPPA violation.  Yet, Defendants continued to share subscribers' PII in violation of the VPPA.

143.    The UNL Defendants operationally handed over control of its website to the Operator Defendants.  The Operator Defendants completely disregard Defendants' obligation under the VPPA by loading the tracking methods, including the Facebook Pixel, onto the Team Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.

144.    Despite brazenly violating the VPPA, subscribers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties.  Worse, in further violation of the VPPA, Defendants did not seek or obtain any form of consent from subscribers for the use of the tracking methods to share information improperly pulled from the Team Website.

145.    This threat of injury to Plaintiff- and the putative class from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is protected from future disclosure.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representatives of the Class and his counsel as Class Counsel;

(b)    For an order declaring that the Defendants' conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendants to immediately (i) remove the Pixel from the Team Website or (ii) add, and obtain, the appropriate consent from subscribers;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

(g)    For Defendants to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)     For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs; and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: April 14, 2023                    **CAR & REINBRECHT, P.C.**

By: _/s/ Pamela A. Car_
Pamela Car #8770
William L. Reinbrecht  #20138
Car & Reinbrecht, P.C., L.L.O.
2120 S. 72nd Street, Suite 1125
Omaha, NE 68124
Telephone: (402) 391-8484
Email: pacar@cox.net

Mark S. Reich*
Courtney Maccarone*
Gary I. Ishimoto*
**LEVI & KORSINSKY, LLP**
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email:cmaccarone@zlk.com
Email:gishimoto@zlk.com

*Counsel for Plaintiff and
Putative class*

*\*pro hac vice* forthcoming