IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| TIM PETERSON, on Behalf of Himself and All Others Similarly Situated, | |
| Plaintiff, | **NO. 8:23-CV-146** |
| vs. | **MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| LEARFIELD COMMUNICATIONS, LLC, SIDEARM SPORTS, LLC, | |
| Defendants. | |

Plaintiff Tim Peterson has brought a class action suit on behalf of subscribers to huskers.com (the Team Website), a website alleged operated by defendants Learfield Communications, LLC, and Sidearm Sports, LLC (collectively, Defendants or Learfield[1]) for the University of Nebraska-Lincoln (UNL) athletic department.[2] Filing 1. Plaintiff's suit contains a single claim: a violation of the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710, *et seq.* Filing 1 at 31–35. Defendants have moved to dismiss the Complaint pursuant to of the Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7) for lack of subject matter jurisdiction,

---

[1] Plaintiff alleges, "In 2014, Learfield purchased Sidearm Sports." Filing 1 at 5 (¶ 17). Accordingly, the Court at times refers to Learfield and Sidearm Sports collectively as "Learfield."

[2] Plaintiff originally brought claims against UNL and the UNL athletic department. Filing 1. Plaintiff voluntarily dismissed the UNL Defendants. Filing 36; Filing 40. Defendants Learfield and Sidearm Sports are the only remaining defendants.

failure to state a claim, and failure to join a necessary party, respectively. For the reasons stated here, the Court grants Defendants' Motion.

# I.   INTRODUCTION

## A.   Background of the Video Privacy Protection Act

"The impetus for [the VPPA] occurred when a weekly newspaper in Washington published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store" while "the Senate Judiciary Committee was holding hearings on Judge Bork's nomination to the Supreme Court." S. Rep. 100-599, at *5 (1988).[3] The Senate Report for the VPPA stated that its purpose is "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.*, at *1. As explained by the Third Circuit Court of Appeals, "[t]he Act creates a private cause of action for plaintiffs to sue persons who disclose information about their video-watching habits." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). The VPPA statute provides, "A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1). Subsection (d) provides relief in the form of "actual damages but not less than liquidated damages in an amount of $2,500," as well as punitive damages and attorneys' fees. *Id.* § 2710(d). The Court will discuss the VPPA in greater detail in the Analysis section.

---

[3] The Court refers to the Senate Report solely to provide background information regarding the VPPA.

## B. Factual Background

The Court notes at the outset that the Complaint contains detailed factual allegations of a technical nature which Plaintiff at times depicts through images. *See, e.g.*, Filing 1 at 23–25. Fortunately, an elaborate discussion of the technical aspects of this case is unnecessary because the Court ultimately grants Defendants' Motion to Dismiss on more familiar grounds: statutory interpretation. Nevertheless, the Complaint contains numerous factual allegations, which the Court details below. The Court considers the following nonconclusory allegations as true for the purposes of ruling on this motion. *See Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)).

### 1. The Parties

Plaintiff Tim Peterson is a Colorado resident who allegedly subscribed to Nebraska Cornhuskers' newsletters in or around 2016. Filing 1 at 4 (¶ 15). Plaintiff alleges that he never agreed to have his "personal identifying information" (PII) shared with Facebook when he subscribed to the newsletters. Filing 1 at 4 (¶ 15). Nonetheless, three or four times per month, Plaintiff allegedly "watched pre-recorded video content on the Team Website using a device that was signed into Facebook, as recently as December 2022, resulting [in his] PII and Video Watching Data being shared with Facebook." Filing 1 at 4 (¶ 15). Plaintiff avers that he "would continue or resume using the site should the offending tracking tools be removed or rendered inactive." Filing 1 at 4 (¶ 15). Plaintiff brings this suit on behalf of himself and on behalf of a class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Filing 1 at 3 (¶ 13).

Defendant Learfield is an LLC formed in Delaware with its headquarters in Texas. Filing 1 at 3 (¶ 16). Defendant Sidearm Sports is an LLC formed in Missouri with its headquarters in New York. Filing 1 at 4 (¶ 17). Learfield purchased Sidearm Sports in 2014." Filing 1 at 5 (¶ 17).

3

Plaintiff alleges that collectively, Defendants "run[ ] and operate[ ] the websites of 1,100 college and universities, including 300 of the 320 schools in Division 1 Sports." Filing 1 at 10 (¶ 34). Plaintiff avers that Defendants' "single most opted in product" is a "streaming platform [that] deploys an original solution where fans [are] able to find live, original and pre-recorded content all in one central location." Filing 1 at 10 (¶ 37) (alterations in original).

### 2. The Team Website and Newsletters

Plaintiff alleges that Defendants Learfield and Sidearm Sports operate huskers.com (the Team Website), which "provides users with access to video content related to the university's athletics, including pre-recorded clips of games, interviews with players and team staff, sports analysts, and more." Filing 1 at 1–2 (¶¶ 1–2). Plaintiff describes Defendants' alleged "complete control of the Team Website," as follows:

> Operator Defendants have the ability to lock the client out of the Team Website; Operator Defendants derive revenue from the Team Website through revenue sharing with advertisers; Operator Defendants reserve their own advertising space on the Team Websites; and Operator Defendants set and implement [their] own code for generating and tracking advertising on the website, user tracking, video hosting, subscription services, and website design.

Filing 1 at 14 (¶ 52). Plaintiff alleges, "The Team Website does not seek nor obtain permission from their subscribers, including Plaintiff and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook." Filing 1 at 26 (¶ 96). More specifically, Plaintiff avers,

> 98.    To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as [a] checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

Filing 1 at 26 (¶ 98).

According to Plaintiff, Team Website users can subscribe to "newsletters," which include "email updates regarding the Team and content on the Team Website" and "links to the Team Website, which contains articles and videos." Filing 1 at 2 (¶ 3). Plaintiff alleges that users obtain access to the newsletters "in exchange for their contact information." Filing 1 at 2 (¶ 3). Plaintiff further alleges that, UNL "benefits from the value created through its use of free e-newsletters and its subscription-based service model . . . through [the] interplay between it [sic] free newsletters and increasing traffic to its website" and "by creating brand awareness and broaden[ing] interest in the organization itself." Filing 1 at 25–26 (¶¶ 93–95). Plaintiff avers, "The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent." Filing 1 at 26 (¶ 97).

### 3. *Defendants' Alleged Use of Facebook Pixel to Capture Data*

Plaintiff alleges that "on the Team Website . . . subscribers' personal identifying information ('PII') [is] captured by the Facebook Pixel utilized by Defendants . . . and then transferred to Facebook thereby exposing the subscribers' PII to any person of ordinary technical skill who received that data." Filing 1 at 2 (¶ 4). Plaintiff describes "Facebook Pixel" as "a toolset that allows websites to track user activity by monitoring for triggered events and sharing that data with Facebook," the popular social media website. Filing 1 at 14 (¶ 53).[4]

---

[4] In addition to Facebook Pixel, Plaintiff alleges that "Defendants consistently uses [sic] tracking tools, such as pixels (including Facebook's and [their] own), Google's suite of tools (including Google Analytics and Doubleclick Floodlight), comScore, and Salesforce DMP." Filing 1 at 14 (¶ 53). Specifically, Plaintiff alleges that its own pixel (the Sidearm Pixel) "is also used to monitor user activity on the Team Websites," including by "track[ing] which webpages a user visits, when those webpages were published, [ ] which sport a user interacts with," and "which embedded videos, pre-recorded and streaming, were watched on any given webpage." Filing 1 at 14–15 (¶¶ 54–55). Plaintiff avers that the data captured by the Sidearm pixel is not provided to UNL but is instead "retained for [Defendants'] own use." Filing 1 at 16 (¶ 56). However, Plaintiff does not allege that use of any tracking tools besides Facebook Pixel violated the VPPA. *Cf.* Filing 1 at 28 (¶ 107) ("Plaintiff brings this action individually and on behalf of the following Class: All persons in the United States with a subscription to the Cornhuskers' Website that had their personal information improperly disclosed to Facebook through the use of the Pixel[.]").

Plaintiff avers that Defendants are responsible for non-consensual data capture by Facebook Pixel:

9.    Defendants purposefully implemented and utilized the Pixel, which tracks user activity on the Team Website and discloses that information to Facebook to gather valuable marketing data. The Pixel cannot be placed on a Team Website without steps taken directly by Defendants or on behalf of Defendants (e.g., by a website manager). The Pixel cannot be placed on the Team Website by Facebook without the knowledge and cooperation by Defendants.

10.    Defendants do not seek and have not obtained consent from users or subscribers to utilize the Pixel to track, share, and exchange their PII and Video Watching Data with Facebook.

11.    Defendants knew that their Pixel resulted in users' PII and Video Watching Data being shared (resulting in VPPA violations), and that they failed to obtain users' consent to allow their Pixel to operate in a way that shares users' protected information with Facebook.

. . .

65.    The Pixel is a marketing tool that must be added by website developers to a website. A website must link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel. Thus, the addition of a Pixel to a website is an affirmative act that must be done purposefully. The Team went through, or directed its web site developers to go through, these steps to add the Pixel to its website.

. . .

68.    The owner of a website – here, Defendants – holds the decision-making authority over the placement of the Pixel on its site. The owner may not hand-select every detail associated with the website, ranging from the use of certain font, colors, etc., to the employment of tracking tool, such as the Pixel, or a keystroking monitor, or which and whether terms and conditions should be associated with its website, newsletter, or any other aspect of its business. The level of management or oversight by the owner, however, does not alter or reduce, and certainly does not eliminate, its responsibility over the information displayed on its site, made available to visitors, or what is gathered about its user and then shared with third parties.

70.    The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site.

. . .

6

> 75.     A Pixel cannot be placed on a website by a third-party without being given access by the site's owner. There are no known instances in which Facebook placed, or has been accused of placing, a Pixel on a website that it did not own.

Filing 1 at 3, 19–20 (¶¶ 9–11, 65, 68, 70). Thus, Plaintiff alleges that Defendants purposefully enabled Facebook Pixel to collect data from users of the Team Website.

Plaintiff also describes in detail the process by which Facebook Pixel operates to track and share user activity. *See* Filing 1 at 22–25 (¶¶ 78–92).[5] Plaintiff further avers that Defendants "are capable, at any time, of ending [the] improper sharing of subscribers' PII," "of stopping the employment and use of the Facebook Pixel," and "of ending [the] continued and ongoing VPPA violations." Filing 1 at 16 (¶ 57).

### C.  Procedural Background

Plaintiff filed the Complaint against Learfield, Sidearm Sports, UNL, and the UNL athletic department on April 16, 2023. Filing 1. Plaintiff brought the Complaint "individually and on behalf of the following Class: All persons in the United States with a subscription to the Cornhuskers' Website that had their personal information improperly disclosed to Facebook through the use of the Pixel[.]" Filing 1 at 28 (¶ 107). The Complaint contains one Count, alleging a violation of the Video Privacy Protection Act. Filing 1 at 31–34 (¶¶ 121–138). In addition to damages and attorneys' fees, Plaintiff also seeks declaratory and injunctive relief. Filing 1 at 35–36. On August 8, 2023, Plaintiff voluntarily dismissed UNL and the UNL athletic department as defendants. Filing 36; Filing 40. On August 14, 2023, Defendants filed the Motion to Dismiss now before the Court. Filing 37. Defendants seek dismissal "based on Learfield's sovereign immunity, failure to join indispensable parties, and failure to state a claim upon which relief can be granted." Filing 37.

---

[5] Because this detailed technical information is not pertinent to the analysis in this case, the Court omits it.

Defendants also challenged the VPPA as an unconstitutional violation of the First Amendment. Filing 38 at 17–21. On October 13, 2023, the United States intervened as an interested party to defend the constitutionality of the VPPA. Filing 48.

## II.  Preliminary Matters

As discussed below, the Court concludes that Plaintiff failed to state a claim upon which relief can be granted because Plaintiff failed to allege that he was a "consumer" protected by the statute. Accordingly, although the United States intervened to defend the constitutionality of the VPPA, the Court need not consider Defendants' constitutional challenge to the statute. In addition, because Plaintiff failed to state a claim, he is not entitled to injunctive or declaratory relief.

## III. ANALYSIS

As discussed above, Defendants seek to dismiss the Complaint for lack of subject matter jurisdiction, for failure to join a necessary party, and for failure to state a claim. The Court will consider these arguments in turn.

### A.  The Court Has Subject Matter Jurisdiction

*1.  The Parties' Arguments*

Dismissal based on lack of subject matter jurisdiction under Rule 12(b)(1) is only raised insofar as Defendants contend that they have sovereign immunity as government contractors. Filing 38 at 3 ("Learfield is an arm of the state and, therefore, also immune from suit."). Defendants refer the Court to a Nebraska Supreme Court decision, which states that "the Board and the University of Nebraska are state agencies" and "a suit against a state agency is a suit against the state." *Doe v. Bd. of Regents of Univ. of Nebraska*, 280 Neb. 492, 510, 788 N.W.2d 264, 281 (2010). Defendants contend that they are arms of the state as "contractors for the UNL entities"

and that Defendants and the UNL entities are alleged to have "collectively committed a singular violation of the VPPA." Filing 38 at 3.

Plaintiff disputes that Defendants are entitled to sovereign immunity, arguing instead that Defendants are independent from UNL. Filing 38 at 5–9. Regarding Defendants' independence, Plaintiff refers the Court to several allegations in his Complaint, Filing 43 at 6–7, which Plaintiff alleges Defendants "do not refute or address":

> 47. In addition to the control Operator Defendants[6] have over the operation, content, and overall management of the college team websites managed through the Operator Defendants' Web Services, Operator Defendants have the ability to unilaterally cut of or shut down college team websites.
>
> . . .
>
> 52. Operator Defendants develop, operate, and own the Team Website. Operator Defendants effectively retain complete control of the Team Website. Operator Defendants have the ability to lock the client out of the Team Website; Operator Defendants derive revenue from the Team Website through revenue sharing with advertisers; Operator Defendants reserve their own advertising space on the Team Websites; and Operator Defendants set and implement [their] own code for generating and tracking advertising on the website, user tracking, video hosting, subscription services, and website design.
>
> . . .
>
> 58. Operator Defendants also standardize, host, and control the video hosting services and the Team Website's video content.
>
> . . .
>
> 61. Operator Defendants even manage the advertising for the Team Websites, for which they carve out their own advertising space and/or share in the revenue of the advertising on the team site. Operator Defendants' control over the advertising is highlighted by the presence of CBS code even where CBS does not host the Team's videos[.]

---

[6] Plaintiff uses the term "Operator Defendants" to refer to Learfield and Sidearm Sports when the UNL entities were still parties to the case.

. . .

69. To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel. For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage by multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.

70. The website operator must utilize the tools made available to it by Facebook in order to cause the Pixel to be created and added to its site. The website operators name the Pixel.

71. Once the Pixel is created, the website operator will assign access to the Pixel to specific people for management purposes,44 as well as connect the Pixel to a Facebook Ad account.

. . .

96. The Team Website does not seek nor obtain permission from their subscribers, including Plaintiff and the Class, to share the subscribers' PII or Video Watching Data with third-parties, including Facebook.

97. The sign-up processes for the Team Website's newsletters do not seek nor obtain informed, written consent.

98. To the extent information about any of the Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; (iii) is not offered to users as checkbox or e-signature field, or as any form of consent; and (iv) does not include terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party.

99. The Team Website includes a newsletter sign-up[.]

Filing 1 at 13–26 (¶¶ 47, 52, 58, 61, 69–71, 96–99). According to Plaintiff, these allegations show

that Defendants are independent from UNL and are therefore not entitled to sovereign immunity.

Filing 43 at 5–9. The Court agrees with Plaintiff.

### 2. Applicable Standards

#### a. Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for a pre-answer motion to dismiss for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). The Eighth Circuit Court of Appeals has explained that on a Rule 12(b)(1) motion,

> The plaintiff bears "the burden of proving the existence of subject matter jurisdiction," and we may look at materials "outside the pleadings" in conducting our review. [*Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc)] (quoting *Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005)). Because of the "unique nature of the jurisdictional question," *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990) (citation omitted), it is the court's duty to "decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue," *id.* at 730. As such, if the court's inquiry extends beyond the pleadings, it is not necessary to apply Rule 56 summary judgment standards. *Id.* at 729. Rather, the court may receive evidence via "any rational mode of inquiry," and the parties may "request an evidentiary hearing." *Id.* at 730 (quoting *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986)). Ultimately, the court must rule upon "the jurisdictional issue [unless it] is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" *Id.* (quoting *Crawford*, 796 F.2d at 928).

*Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019); *Am. Fam. Mut. Ins. Co. v. Vein Centers for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019) ("[A] motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) raises a factual challenge to the court's jurisdiction, and courts may look to evidence outside the pleadings and make factual findings." (citing *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018)).

The *Buckler* decision suggests that a challenge to subject matter jurisdiction pursuant to Rule 12(b)(1) is always "factual," but "facial" challenges are also possible:

> In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir.1990). In a factual attack, the "non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* If the

jurisdictional issue is "bound up" with the merits of the case, the district court may "decide whether to evaluate the evidence under the summary judgment standard." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir.2018). This court is bound by the district court's characterization of the Rule 12(b)(1) motion. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir.2016) ("The method in which the district court resolves a Rule 12(b)(1) motion—that is, whether the district court treats the motion as a facial attack or a factual attack—obliges us to follow the same approach.").

Croyle by & through *Croyle v. United States*, 908 F.3d 377, 380–81 (8th Cir. 2018).

In their Reply Brief, Defendants designate their challenge as a "facial attack." Filing 49 at 5. Under these circumstances, Plaintiff is entitled to Rule 12(b)(6) "safeguards." *Croyle*, 908 F.3d at 380. The "safeguards" here mean that the Court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.'" *Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (quoting *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)). Plaintiff included arguments regarding sovereign immunity based on materials included in an index filed alongside Plaintiff's Brief in opposition to Learfield's Motion to Dismiss. Filing 43 at 7. However, because Defendants have designated their challenge as "facial," Filing 49 at 5, the Court will only consider the pleadings in ruling on the Rule 12(b)(1) Motion.

b. Sovereign Immunity

The Court observes at the outset that most cases regarding claims of sovereign immunity do not involve corporate entities. *See, e.g.*, *Pub. Sch. Ret. Sys. of Missouri v. State St. Bank & Tr. Co.*, 640 F.3d 821, 826, 829 (8th Cir. 2011) (holding that sovereign immunity applied where "the State of Missouri created [the Public School Retirement System of Missouri] and [the Public Education Employee Retirement System of Missouri]" and where "Missouri statutes characterize the Retirement Systems as 'state agenc[ies]'"). Nevertheless, the Eighth Circuit has stated that "the ultimate question of whether an entity is an arm of a State for purposes of the Eleventh Amendment

turns on whether a State is the real party in interest in a case involving the entity." *Id.* at 826 (citing *Sherman v. Curators of the Univ. of Mo.*, 16 F.3d 860, 863 (8th Cir.1994) ("Courts considering an entity's claim of eleventh amendment immunity must therefore determine whether the suit is in reality a suit against the state." (internal quotation marks omitted))). The "arm-of-a-State test requires a close analysis of [Learfield's] relationship with the State of [Nebraska]." *Id.* at 827. "Although whether [Defendants] are arms of the State of [Nebraska] is a question of federal law, [the Court must] engage in a detailed analysis of state law." *Id.* (citations omitted). Considerations under this test include (1) Defendants' "independence from the State of" Nebraska and (2) "how a money judgment in litigation involving [Defendants] could affect the State of [Nebraska's] treasury." *Id.* (citations omitted).

### i. Operational and Political Independence

Regarding the "independence" consideration, the Court considers whether "state statutes greatly restrict [Defendants'] operational independence" and whether Defendants have "political independence" from the State of Nebraska. *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 828. "Courts generally assess an entity's independence in comparison to the type of independence that a political subdivision possesses." *Id.* at 826 (citations omitted). "The more an entity's independence resembles that of a political subdivision, the less likely the entity is an arm of a State." *Id.* (stating that "'counties and similar municipal corporations' are not arms of States" (quoting *Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977))). In addition, "characteristics of operational independence may include being organized as a 'body corporate,' possessing the ability to buy, sell, and hold property, and possessing the ability to sue and be sued in the entity's own name," but "possession of these powers . . . does not preclude a finding that they are arms of the State." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 827–28 (noting that "[t]he

13

Supreme Court has held an entity to be an arm of a State despite its ability to sue and be sued in its own name" and that "the Second Circuit has held an entity to be an arm of a State despite its designation as a corporate body" (citing *State Highway Comm'n of Wyoming v. Utah Const. Co.*, 278 U.S. 194, 199 (1929), and *McGinty v. New York*, 251 F.3d 84, 96 (2d Cir.2001))).

ii.  Effect of a Money Judgment on the State

Regarding whether or how a money judgment could impact the State's treasury, the Eighth Circuit has described "this factor as 'more important' than others when determining whether an entity is an arm of a State." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 830 (citation omitted). "If both 'legally and practically' a money judgment will have no [e]ffect on a State's treasury, then the entity is not an arm of a State." *Id.* (citation omitted). In addition, "an entity is more likely to be an arm of a State if a State makes annual appropriations to finance the entity's operating expenses or if a State retains custody over the entity's funds." *Id.*

> 3.  *Application*
>
>> a.  Plaintiff Alleges that Defendants Are Operationally and Politically Independent from the State of Nebraska

The Court first considers Defendants' operational and political independence from the State of Nebraska. As discussed above, Plaintiff alleges that "Defendants develop, operate, [ ] own[,] . . . effectively retain complete control of . . . [and] have the ability to lock the client [UNL] out of the Team Website." Filing 1 at 14 (¶ 52). Keeping in mind that the Court must "accept the facts alleged in the complaint as true," *Bauer*, 25 F.4th at 589, having "complete control of" the subject matter of this litigation—UNL's website—undoubtedly constitutes "operational independence." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 828. In addition, "as a 'body corporate'"—both Defendants are LLCs—"the ability to buy, sell, and hold property, and . . . the

14

ability to sue and be sued in the entity's own name" favors Defendants' operational independence. *Id.* at 827. Finally, there is nothing in Plaintiff's Complaint that suggests Defendants lack "political independence" from the State of Nebraska; rather, Defendants "represent[ ] more than 200 of the nation's top collegiate properties including the NCAA and its 89 championships, NCAA Football, leading conferences, and many of the most prestigious colleges and universities in the country." Filing 1 at 9 (¶ 31). This suggests that the politics of the State of Nebraska have little if anything to do with Defendants' independence. On the face of the Complaint, Defendants are independent from the State of Nebraska. This consideration weighs against finding that Defendants have sovereign immunity.

> b. Defendants' Payment of a Money Judgment Would Not Impact Nebraska's Treasury

There are simply no facts in the Complaint suggesting that a money judgment against Defendants would somehow affect Nebraska's treasury. Nor is there any indication that Nebraska "makes annual appropriations to finance [Defendants'] operating expenses or . . . retains custody over [Defendants'] funds." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 830. Therefore, this consideration also weighs against finding sovereign immunity.

> c. Defendants Do Not Have Sovereign Immunity

As pleaded by Plaintiff, this is not a case where "a State is the real party in interest in a case involving the entity." *Pub. Sch. Ret. Sys. of Missouri*, 640 F.3d at 826. Because neither consideration favors finding that Defendants have sovereign immunity, Defendants' Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction is denied. As discussed above, this was a "facial attack" to subject matter jurisdiction, meaning the Court had to accept as true all Plaintiff's allegations in the Complaint. Therefore, this ruling would not preclude a later "factual" challenge

15

to subject matter jurisdiction if Plaintiff's Complaint were to survive Defendants' Motion to Dismiss. *See* Rule 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Wagstaff & Cartmell, LLP v. Lewis*, 40 F.4th 830, 838 (8th Cir. 2022) ("Subject-matter jurisdiction can never be waived or forfeited." (citations omitted)).

### B.  Plaintiff Did Not Fail to Join Any Indispensable Party

*1.  The Parties' Arguments*

Defendants also moved to dismiss pursuant to Rule 12(b)(7) for failure to join (or more accurately, for voluntarily dismissing) UNL, which Defendants contend is a necessary party under Rule 19. Filing 37; Filing 38 at 11–12. Defendants argue that "the UNL Entities are necessary parties because Plaintiff's claims concern allegedly concerted conduct by the UNL Entities and Learfield, which allegedly produced a singular purported statutory violation." Filing 38 at 11. Defendants further argue that "without the UNL Entities, the Court cannot accord complete relief, and Learfield would face a substantial risk of incurring double or otherwise inconsistent obligations, which would be very prejudicial to Learfield and could not be lessened or avoided." Filing 38 at 11. Finally, Defendants contend that UNL's "interest in the content and functionality of their own website and the information that is allegedly collected via the Facebook Pixel . . . would be impaired in their absence." Filing 38 at 11. Because UNL has sovereign immunity, as discussed above, joining it as a party is not feasible, and Defendants ask the Court to dismiss the action "on equity and good conscience." Filing 38 at 11.

Plaintiff contends that dismissal pursuant to Rule 12(b)(7) is not appropriate because "[t]he UNL Entities are not indispensable parties"; rather, "Defendants do not present even a single scenario . . . in which they would conceivably incur double obligations, or inconsistent obligations,

16

or be prejudiced in any way" if UNL is not joined under Rule 19. Filing 43 at 16. Plaintiff also points out that "UNL Entities themselves do not maintain that they are indispensable or must be joined in this action. To the contrary, they engaged in the discussions that prompted and led to their dismissal from the action." Filing 43 at 17. Defendants in their Reply contend that Plaintiff's argument that the UNL Entities are not indispensable parties "makes no sense in light of the fact that this case concerns the UNL Entities' website." Filing 49 at 7.

   *2. Applicable Standards*

   Rule 12(b)(7) provides as a ground for dismissal a plaintiff's "failure to join a party under Rule 19." Rule 19(a)(1) states:

> (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). "The focus of Rule 19(a)(1) is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person." *Cedar Rapids Bank & Tr. Co. v. Mako One Corp.*, 919 F.3d 529, 534–35 (8th Cir. 2019) (quoting *LLC Corp. v. Pension Ben. Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983)) (cleaned up). In addition, "a person does not become indispensable to an action to determine rights under a contract simply because that person's rights or obligations under an entirely separate contract will be affected by the result of the action." *Id.* at 535 (citation omitted). The Eighth Circuit has also rejected the

17

"flawed premise that joint tortfeasors are necessary parties under Rule 19(b). 'It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.'" *Lustgraaf v. Behrens*, 619 F.3d 867, 885 (8th Cir. 2010) (quoting *Bailey v. Bayer CropScience L.P.*, 563 F.3d 302, 308 (8th Cir.2009)). Unlike a motion to dismiss for failure to state a claim under 12(b)(6), courts can consider materials beyond the pleadings on a motion to dismiss for failure to join a necessary party without converting the motion into one for summary judgment. *Cf.* Fed. R. Civ. P. 12(d).

   *3. Application*

   The Court concludes that UNL is not an indispensable party. Complete relief may be accorded among the existing parties because Plaintiff alleges that Defendants are solely responsible for the alleged statutory violation. Contrary to Defendants' claims, Plaintiff does not allege "concerted conduct by the UNL Entities and Learfield, which allegedly produced a singular purported statutory violation," Filing 38 at 11; rather, as explained in the above discussion on sovereign immunity, Plaintiff alleges that Defendants Learfield and Sidearm Sports "develop, operate, [ ] own[,] . . . effectively retain complete control of . . . [and] have the ability to lock the client [UNL] out of the Team Website." Filing 1 at 14 (¶ 52). This allegation is inconsistent with "concerted conduct." The Court also disagrees with Defendants' contention that "Learfield would face a substantial risk of incurring double or otherwise inconsistent obligations." Filing 38 at 11. Defendants provide no reason to believe that their former co-Defendant, UNL, could have a VPPA claim against Defendants. Indeed, as discussed below, not even Plaintiff has a VPPA claim against Defendants. Finally, Defendants' averment that UNL will be deprived of its interests if not joined is unavailing. The State of Nebraska could have waived its sovereign immunity, *see, e.g.*, *Fryberger v. Univ. of Arkansas*, 889 F.3d 471, 473 (8th Cir. 2018) ("A State, however, may choose

18

to waive its immunity in federal court at its pleasure." (quoting *Sossamon v. Texas*, 563 U.S. 277, 284 (2011))), yet it did not. Thus, UNL is not a necessary party under Rule 19, and Defendants' Motion to Dismiss pursuant to 12(b)(7) is denied.

### C. Plaintiff Fails to State a Claim Upon Which Relief Can Be Granted

#### 1. *The Parties' Arguments*

Plaintiff alleges in the Complaint that Defendants are "video tape service providers" (VTSPs) "because they create, host, and deliver hundreds of videos on [their] websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." Filing 1 at 32 (quoting 18 U.S.C. § 2710(a)(4)). Plaintiff alleges that he and other class members are "'consumers' because they subscribed to the Team newsletters." Filing 1 at 32 (quoting 18 U.S.C. § 2710(a)(1)). Finally, Plaintiff alleges that information disclosed by Defendants to Facebook constitutes "Plaintiff's and the Class members' personally identifiable information." Filing 1 at 32. Plaintiff avers that these allegations state a violation of the VPPA. Filing 1 at 31–35 (¶¶ 121–145).

Defendants argue the Complaint must be dismissed for several reasons. First, "Plaintiff does not—and cannot—allege that Learfield disclosed any information that would readily permit an ordinary person to determine Plaintiff's video viewing history." Filing 38 at 12. "Second, Plaintiff does not—and cannot—allege that he is a 'consumer' protected by the VPPA." Filing 38 at 13. Third, "Plaintiff does not—and cannot—allege the Learfield Defendants are 'VTSPs.'" Filing 38 at 16. Fourth, "Plaintiff does not—and cannot—allege that Learfield knowingly disclosed PII in violation of the VPPA." Filing 38 at 18.

### 2.   *Applicable Standards*

#### a.   12(b)(6) Standards

The typical grounds for Rule 12(b)(6) motions are the insufficiency of the factual allegations offered to state claims. To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, "'threadbare recitals of the elements of a cause of action' cannot survive a [Rule 12(b)(6)] motion to dismiss." *Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199, 1205 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, as the Eighth Circuit Court of Appeals has explained, "A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the defendant is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 680-83). To put it another way, a court "must determine whether a plaintiff's complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022) (quoting *Braden v. WalMart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). Thus, "[a] claim is plausible when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Christopherson v. Bushner*, 33 F.4th 495, 499 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). In contrast, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks and citations omitted). The Eighth Circuit Court of Appeals has cautioned that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594.

In ruling on a Rule 12(b)(6) motion, a court must "accept 'the facts alleged in the complaint as true and draw[ ] all reasonable inferences in favor of the nonmovant.'" *Bauer*, 25 F.4th at 589. On the other hand, "[m]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). A court also need not accept a pleader's "legal conclusions drawn from the facts." *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 755 (8th Cir. 2021).

Rule 12(b)(6) also permits dismissal when a claim is not cognizable under applicable law. *See, e.g.*, *Couzens v. Donohue*, 854 F.3d 508, 517 (8th Cir. 2017) (dismissal was appropriate where Missouri did not recognize a claim for false light invasion of privacy); *Thomas v. Bd. of Regents of Univ. of Nebraska*, No. 4:20CV3081, 2022 WL 1491102, at *18 (D. Neb. May 11, 2022) (agreeing with defendant that the plaintiffs had failed to state a claim, because a disparate-impact claim is not cognizable under the Equal Protection Clause); *Freeney v. Galvin*, No. 8:19CV557, 2020 WL 229996, at *2 (D. Neb. Jan. 15, 2020) (finding the plaintiff failed to state a § 1983 claim against the manager of his private place of employment because such a claim is not cognizable where a private person is not a state actor or engaged in joint action with the state or its agents). In such cases, the plaintiff failed to state a claim that was legally cognizable as opposed to factually plausible.

### b.   Statutory Interpretation Standards

Standards for statutory interpretation are familiar. "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others[:] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut*

*Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Thus, "[t]he starting point for interpreting a statute is the language of the statute itself." *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 824 (8th Cir. 2010) (cleaned up). The Court's "job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd v. United States*, 138 S. Ct. 2067, 2070 (2018). The ordinary meaning controls "unless the context in which the word[s] appear[ ]" suggests otherwise. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). The Court aims "to avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress." *Westerfeld*, 621 F.3d at 824.

### 3. *The VPPA Statute*

The VPPA statute provides, "A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b). The statute defines the terms "consumer," "personally identifiable information," and "video tape service provider," as follows:

(a) **Definitions**.--For purposes of this section--

(1) the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;

. . .

(3) the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

(4) the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person

or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.

18 U.S.C. § 2710(a). Thus, to state a claim, Plaintiff must have alleged that (1) he is a "consumer" (2) whose "personally identifiable information" (3) was knowingly disclosed by a "video tape service provider." The Court concludes that Plaintiff has not plausibly alleged he is a "consumer" within the meaning of the VPPA.

### 4.   *Plaintiff Is Not a Consumer Within the Meaning of the VPAA*

#### a.   Defendants' Arguments that Plaintiff Is Not a Consumer

In their briefs, Defendants raised three arguments that Plaintiff is not a "consumer" within the meaning of the VPPA, but the Court only finds the third persuasive. Defendants first contend that Plaintiff failed to allege he is a "consumer" because there is not "a single allegation showing that Plaintiff rented, purchased, or subscribed to any goods or services *from Learfield*," specifically. Filing 38 at 13 (emphasis in original). Plaintiff disputes Defendants' contention that Plaintiff did not consume goods or services from Learfield specifically, stating, "Defendants are the owners and operators of the Team Website at issue and directly solicited Plaintiff's contact information in exchange for the Team Website's newsletter subscription." Filing 43 at 12. The Court disposes of Defendants' first argument, having already found above that Plaintiff alleged Defendants have "complete control of the team website," Filing 1 at 14 (¶ 52), meaning that any goods or service that Plaintiff "consumed" were from Defendants.

Defendants further argue that "Plaintiff is not a consumer protected by the VPPA" because "Plaintiff is a consumer of other products or services unrelated to rental, sale, or delivery of video materials." Filing 38 at 14. Plaintiff responds that "[t]he VPPA does not define or otherwise restrict the meaning of 'consumer' to a person who subscribes to goods or services constituting 'audio

visual materials.'" Filing 43 at 13. The Court also disposes of this argument because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank*, 503 U.S. at 253–54, and there is nothing in the statutory language that restricts "goods or services" to "video materials," as Defendants contend. The statute only restricts the "goods or services" to those obtained "from a video tape service provider." 18 U.S.C. § 2710(a)(1). There is nothing about "the context in which the word[s] appear[ ]" that suggests otherwise. *Taniguchi*, 566 U.S. at 569.

Defendants make one final argument that Plaintiff is not a consumer: that "signing up for an email newsletter does not make a person a 'consumer' under the VPPA." Filing 49 at 8. By this, the Court understands Defendants to argue that Plaintiff does not allege adequate "factual allegations [to] meet the standard for a 'consumer'" within the meaning of the VPPA. Filing 49 at 8. Defendants' full argument on this point is as follows:

> [S]ince the time Learfield filed its opening brief, another court dismissed VPPA claims asserted against Learfield in a case raising similarly deficient factual allegations brought by this same Plaintiff's counsel, on the basis that signing up for an email newsletter does not make a person a "consumer" under the VPPA. *Edwards*[ *v. Learfield Commc'ns, LLC*, No. 1:23-cv-65 (N.D. Fla. October 6, 2023), at *14] ("Plaintiffs' signing up for email updates here did not make them 'subscribers.' Signing up requires no 'durable' commitment or real exchange at all…Signing up does not grant access to any exclusive or restricted content, much less any exclusive video content."). In doing so, *Edwards* held that such factual allegations did not meet the standard for a "consumer" articulated by the Eleventh Circuit in *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342-43 (11th Cir. 2017) and *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015).

Filing 49 at 8; *see also* Filing 49-1 (copy of *Edwards*). The Court acknowledges that this argument is different from Defendants' earlier argument that "Plaintiff is not a consumer protected by the VPPA" because "Plaintiff is a consumer of other products or services unrelated to rental, sale, or delivery of video materials," Filing 38 at 14, where the present argument does not focus on

24

Plaintiff's consumption of products "unrelated to rental, sale, or delivery of video materials." Instead, the present argument focuses on whether "signing up for an email newsletter . . . meet[s] the standard for a 'consumer'" under the VPPA. Filing 49 at 8. The Court further acknowledges that Defendants made this argument in their Reply Brief.

The Eighth Circuit has stated that normally, courts "refuse to entertain [ ] new argument[s]" that are "assert[ed] for the first time in [a] reply brief." *Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999). In addition, the Eighth Circuit has stated, "The district court d[oes] not abuse its discretion or otherwise commit error by following the court's local rule prohibiting new arguments submitted in a reply brief." *McGhee v. Pottawattamie Cnty., Iowa*, 547 F.3d 922, 929 (8th Cir. 2008). The pertinent local rule provides, "The reply brief may not merely repeat the moving party's initial arguments, but rather must address factual or legal issues raised in the opposing brief. Without leave of court, a reply brief may not raise new grounds for relief or present matters that do not relate to the opposing party's response." NECivR 7.1(c)(2). However, in this case, the local rule did not prohibit Defendants from making the argument in their Reply Brief that "signing up for a newsletter does not make a person a 'consumer'" under the VPPA because this argument is in reply to the following argument raised by Plaintiff in his Opposition Brief:

> On the Team Website, users have the option to subscribe to e-newsletters by providing their contact information, in exchange for an exclusive, scheduled newsletter. These allegations satisfy the 'consumer' element of the VPPA, because the commitment between Operator Defendants to supply periodic newsletters in exchange for Plaintiff's personal contact information is all that the VPPA requires.

Filing 38 at 18. In essence, Plaintiff argues in Opposition that signing up for a newsletter ("providing their contact information, in exchange for an exclusive, scheduled newsletter") makes Plaintiff a "consumer" under the VPPA, and Defendant argues in Reply that it does not. Thus, this is not a "new argument" raised "for the first time" in Defendants' "reply brief." *See Berg*, 169 F.3d

at 1146. Rather, Defendants argument "relate[s] to the opposing party's response" and "address[es]" factual or legal issues raised in the opposing brief." NECivR 7.1(c)(2). In addition, the Eighth Circuit has also stated that a district court does not have to allow a non-movant to file a sur-reply if the movant "simply responded to issues raised by" the non-movant's opposition brief, as Defendants did here. *Cornice & Rose Int'l, LLC v. Four Keys, LLC*, 76 F.4th 1116, 1123 (8th Cir. 2023). Therefore, the Court will consider Defendants argument that "signing up for a newsletter does not make a person a 'consumer'" under the VPPA.

The Court must determine whether Plaintiff alleges adequate "factual allegations [to] meet the standard for a 'consumer'" within the meaning of the VPPA. Filing 49 at 8. Plaintiff does not argue that he is a "purchaser" or "renter," so the Court must only determine whether he has alleged he is a "subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a). The Court concludes that Plaintiff has not alleged he is a "subscriber," meaning he is not a "consumer" afforded protection by the VPPA.

### b. A Survey of Dictionary and Court Definitions of "Subscriber"

The VPPA statute does not state what it means to be a "subscriber of goods or services from a video tape service provider." *See generally*, 18 U.S.C. § 2710. Nor does any party refer the Court to Eighth Circuit or Supreme Court precedent bearing on what it means to be a "subscriber." Therefore, because this is a question of first impression for the Court, the Court will examine how various dictionaries and courts have defined the term.

Black's Law Dictionary defines "subscribe," in relevant part, as "To agree to take and pay for something, esp[ecially] something regularly delivered; esp[ecially], to pay money, usu[ally] annually, to receive a weekly or monthly service, such as a newspaper or magazine." Black's Law Dictionary 1727 (11th ed. 2019). Editions of Black's Law Dictionary more contemporaneous to

26

the passage of the VPPA similarly include some kind of payment within the meaning of "subscribe." Black's Law Dictionary 1596 (4th ed. 1968) (defining "subscribe," in relevant part, as "to agree in writing to furnish money or its equivalent"); Black's Law Dictionary 1427 (6th ed. 1990) (same). Plaintiff appears to acknowledge that some form of transaction is required for a subscription, arguing that users "providing their contact information, in exchange for an exclusive, scheduled newsletter . . . satisf[ies] the 'consumer' element of the VPPA, because the commitment between Operator Defendants to supply periodic newsletters in exchange for Plaintiff's personal contact information is all that the VPPA requires." Filing 43 at 11.

Courts have reached differing definitions of what it means to "subscribe" within the meaning of the VPPA. On the one hand, the Eleventh Circuit held that a plaintiff who merely downloaded an app to watch video clips was not a "subscriber" within the meaning of the VPPA, reasoning that "'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity," such as "payment, registration, commitment, delivery, expressed association, and/or access to restricted content." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (citation omitted). In *Ellis*, the court stated that a person who "is free to delete the app without consequences whenever he likes, and never access its content again" is not a subscriber under the VPPA, noting that "downloading [ ] an app, we think, is the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content." *Id.* at 1257. However, the *Ellis* court stated that "payment is not a necessary element of subscription." *Id.* at 1256.

The Southern District of New York has interpreted "subscriber" slightly differently than the Eleventh Circuit, but still requiring a "durable affiliation" and a "relationship and exchange" to qualify as a "subscriber," stating,

> Whatever the nature of the specific exchange, what remains is the subscriber's deliberate and durable affiliation with the provider: whether or not for payment, these arrangements necessarily require some sort of ongoing relationship between provider and subscriber, one generally undertaken in advance and by affirmative action on the part of the subscriber, so as to supply the provider with sufficient personal information to establish the relationship and exchange.

*Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015). The Court recognizes the above tests both require some exchange of consideration, although not necessarily money, between the alleged "subscriber" and the VTSP to constitute a "subscription."

On the other hand, the First Circuit appears to require only consideration from the alleged subscriber in the form of providing personal information. *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487 (1st Cir. 2016). In *Yershov*, the First Circuit acknowledged that the definition of "subscriber" contemporary to the VPPA may have required some form of valuable consideration, as follows:

> [T]here are other common definitions of the term "subscribe" that include as an element a payment of some type and/or presume more than a one-shot transaction. *See The Random House Dictionary of the English Language* 1896 (2nd ed. 1987) (defining the term "subscriber" as "a person ... that subscribes ... to a publication," the term "subscribes" as "to obtain a subscription," and the term "subscription" as "the right to receive a periodical for a sum paid, usually for an agreed number of issues").

*Yershov*, 820 F.3d at 487. Despite this recognition that in 1987, shortly before the VPPA was enacted, "subscriptions" were understood to "include as an element a payment of some type," the First Circuit concluded that the plaintiff was a subscriber because "[w]hile [the plaintiff] paid no money, access was not free of a commitment to provide consideration in the form of that information"—namely, the plaintiff's "Android ID and [ ] mobile device's GPS location"—"which was of value to [the VTSP]." *Id.* at 489. In other words, the First Circuit held that merely providing some personal identifying information could constitute the "consideration" necessary

28

for a "subscription," whereas the Eleventh Circuit requires more consideration in the form of "payment, registration, commitment, delivery, [ ] or access to restricted content," which seemingly precludes the mere exchange of personal information. *Ellis*, 803 F.3d at 1256.

### c. The Definition of "Subscriber" Most Consistent with the Word's Original Ordinary Meaning

The Court must define "subscriber" in the way most "consistent with [its] ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd*, 138 S. Ct. at 2070. The main disagreement between the Eleventh Circuit and the First Circuit regards the type of consideration required for a user to be considered a "subscriber" within the meaning of the VPPA: the Eleventh Circuit requires "payment, registration, commitment, delivery, [ ] or access to restricted content," which appears to preclude the possibility that mere provision of personal information could serve as consideration, *Ellis*, 803 F.3d at 1256, whereas the First Circuit has held that there could be "consideration in the form of [personal] information," *Yershov*, 820 F.3d at 489. Both courts require some exchange of "consideration" between the alleged "subscriber" and the VTSP, *see Yershov*, 820 F.3d at 489, but neither requires the "subscriber" to provide monetary consideration. *See Ellis*, 803 F.3d at 1256. To the contrary, dictionary definitions of "subscribe" contemporaneous to the VPPA include some form of monetary consideration. *See* Black's Law Dictionary 1596 (4th ed. 1968) (defining "subscribe," in relevant part, as "to agree in writing to furnish money or its equivalent"); Black's Law Dictionary 1427 (6th ed. 1990) (same). Accordingly, the Court disagrees with both the First and Eleventh Circuits and instead adopts the dictionary definition of "subscription" contemporaneous with the adoption of the VPPA, which requires monetary consideration. Thus, the Court holds that a "subscription" requires a "subscriber" "to furnish money or its equivalent."

This definition is most "consistent with [the word's] ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd*, 138 S. Ct. at 2070. In 1988, when Congress passed the VPPA, Plaintiff's relationship with Defendants—that is, Plaintiff's exchange of personal information for email updates from Defendants—was likely not considered a "subscription." *Cf.* Filing 43 at 11 (Plaintiff arguing that "the commitment between Operator Defendants to supply periodic newsletters in exchange for Plaintiff's personal contact information is all that the VPPA requires" for an individual to be a "consumer"). As discussed above, in 1988, a "subscription" was commonly understood to mean "the right to receive a periodical for a sum paid, usually for an agreed number of issues." Random House Dictionary 1896 (2nd ed. 1987). Conversely, the word "subscription" in modern parlance has taken on a new meaning, understood in certain contexts to mean "[t]he fact or action of subscribing to an electronic mailing list, newsgroup, etc." Oxford English Dictionary 6.d., https://www.oed.com/dictionary/subscription_n?tab=meaning_and _use#20093941; *see also* Oxford English Dictionary II.9.f., https://www.oed.com/ dictionary/subscribe_v?tab=meaning_and_use#20092561 (defining "subscribe" as "[t]o become a subscriber to an electronic mailing list, newsgroup, etc. Occasionally in imperative, as an email command. . . . Typically no payment is required for subscriptions of this type."). Thus, the definition of "subscription" at the time the VPPA was enacted included a monetary exchange or its equivalent between provider and subscriber, whereas the "modern" definition may include "signing up" for free email updates by providing personal information. The tests employed by the First Circuit and the Eleventh Circuit may be more consistent with "modern" definition of "subscriber," but the Court's "job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute," *Wis. Cent. Ltd*, 138 S. Ct. at 2070, meaning the contemporaneous definition supersedes any modern definition. Therefore, because the meaning of

the statutory term is the same today as it was in 1988, an individual must "furnish money or its equivalent" to the VTSP to qualify as a "subscriber" within the meaning of the VPPA.

Bolstering this conclusion that using the "modern" definition is inappropriate, it is unlikely that Congress included "subscribers" in the VPPA to protect individuals like Plaintiff who signed up for email alerts informing the user that new videos have been posted for public access on the internet—where the internet was not in existence "at the time Congress enacted the statute." *Wis. Cent. Ltd*, 138 S. Ct. at 2070. Indeed, the Court observes that "the world wide web was not developed until 1989," a year after the VPPA was enacted. *Kubota Corp. v. Shredderhotline.com Co., Inc.*, No. 12-CV-6065, 2013 WL 6096999, at *4 (N.D. Ill. Nov. 20, 2013); *see also Emps. Ins. of Wausau v. McGraw-Edison Co.*, No. 16-CV-1264, 2016 WL 316727, at *1 (W.D. Mich. Jan. 27, 2016) (subsequent history omitted) (noting that "1989 . . . was the same year that English scientist Tim Berners-Lee invented the World Wide Web"). In this context, the likelihood that Congress in 1988 would have understood "subscriber" to include joining a next-generation mailing list is slim at best. *See Wis. Cent. Ltd*, 138 S. Ct. at 2074 ("[I]t's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))).

In addition, the Court disagrees with the First Circuit's reasoning in *Yershov* that "if the term 'subscriber' required some sort of monetary payment, it would be rendered superfluous by the two terms preceding it" (*i.e.*, "purchaser" and "renter"). *Yershov*, 820 F.3d at 487. Like the First Circuit in *Yershov*, this Court aims "to avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress." *Westerfeld*, 621 F.3d at 824 (cleaned up). Nevertheless, according to definitions of the terms

31

contemporaneous to the VPPA, a "purchaser" is "[o]ne who acquires either real or personal property by buying it for a price in money; a buyer; vendee." Black's Law Dictionary, 1235 (6th ed. 1990). A "renter" is someone who pays "rent," or "consideration . . . for use or occupation of property." Black's Law Dictionary, 1297 (6th ed. 1990); *see also Yershov*, 820 F.3d at 488 ("Presumably a person in 1988 who exchanged payment for a copy of a video either retained ownership of the video outright, thereby becoming a 'purchaser' of the video, or received temporary possession of the video for a set period of time, thereby becoming a 'renter.'"). Conversely, "subscriber" is someone who enters into a "subscription," which is a "written contract by which one engages . . . to contribute a sum of money . . . in consideration of an equivalent *to be rendered*, as a subscription to a periodical, a forthcoming book, a series of entertainments, or the like." Black's Law Dictionary, 1427 (6th ed. 1990) (emphasis added). Thus, a "subscriber" obtains future rights in "forthcoming" property or to a "series" of or "periodic" property, whereas a "purchaser" or "renter" obtains present rights to ownership or use/occupation, respectively. This sufficiently differentiates the subscriber on the one hand from the purchaser or renter on the other. Thus, the term "subscriber" is not rendered superfluous in the statute by requiring some form of payment to the provider as opposed to the mere provision of personal information. *Ellis*, 803 F.3d at 1256. Accordingly, the Court must determine whether Plaintiff exchanged monetary consideration or its equivalent to qualify as a "subscriber" within the meaning of the VPPA.

> ### d.  Under this Definition, Plaintiff Is Not a "Subscriber"

The Court will recount the facts related to Plaintiff's alleged relationship to the UNL newsletters:

> 3.  On the Team Website, Defendants offer the option for users to subscribe: (i) through ongoing e-newsletters; and (ii) through signing up for ticket purchasing accounts. Newsletter subscribers are given email updates regarding the Team and

content on the Team Website in exchange for their contact information. The newsletter email updates include links to the Team Website, which contains articles and videos.

. . .

D.      E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Cornhuskers and Subscribers

93.      The Cornhuskers benefits from the value created through [their] use of free e-newsletters and [their] subscription-based service model.

94.      E-newsletters are an important and effective business tool. In fact, 31% of business-to-business marketers say that sending e-newsletters is the paramount way to nurture leads. Additionally, visitors who reach web pages through e-mails, such as e-newsletters, view more pages per session (2.5 to 1.2), as well as visiting web pages more often than those referred to web pages from Facebook. Web page visits stemming from e-mails are also more engaged than those from any other platform. The Cornhuskers, through [their] interplay between it [sic] free newsletters and increasing traffic to [their] website, recognized and utilized this business tool.

95.      E-newsletters further provide value by creating brand awareness and broaden interest in the organization itself. The Cornhuskers' newsletter effectively served to provide this value.

Filing 1 at 2, 25–26 (¶¶ 3, 93–95). These allegations indicate that the only transaction between Plaintiff and Defendants was that Plaintiff "exchange[d] . . . contact information" for Defendants' newsletters, which were comprised of free email updates regarding Nebraska Cornhusker athletics.

Under the definition of "subscription" adopted by the Court above, Plaintiff's mere exchange of personal information and occasional clicks on links contained in the newsletters to videos on the Team Website[7] do not suffice to make Plaintiff a "subscriber." This is so for the simple reason that he never provided monetary consideration or its equivalent in exchange for the

---

[7] Plaintiff alleges that he watched videos on the Team Website, *see* Filing 1 at 4 (¶ 15), but not that he ever interacted with the newsletters or uses the links allegedly contained within the newsletters to access those videos. The Court will nonetheless infer that he did use links in the newsletter, "drawing all reasonable inferences in favor of the nonmovant." *Bauer*, 25 F.4th at 589. In any case, clicking on links does not indicate the type of "payment, registration, commitment, delivery, [ ] or access to restricted content" required to constitute a subscription. *Ellis*, 803 F.3d at 1257.

newsletters. "Contact information" was likely not considered the equivalent of monetary consideration in 1988; indeed, the VPPA statute itself appears to minimize the importance of "disclosure . . . solely of the names and addresses of consumers." 18 U.S.C. § 2710(b)(2)(D); *see also* Filing 1 at 2 (¶ 2) (Plaintiff only alleging that he provided "contact information" to sign up for the newsletter). Under the VPPA, disclosing "to any person" information relating to which "specific video materials" a consumer "requested or obtained" requires "informed, written consent . . . of the consumer." *Id.* § 2710(b)(2)(B). Conversely, disclosing "to any person" a consumer's "name[ ] and address[ ]" (which the Court understands to be "contact information") is permitted so long as the consumer has been "provided . . . the opportunity . . . to prohibit such disclosure." *Id.* § 2710(b)(2)(D)(i); *see also id.* § 2710(b)(2)(D)(ii) (providing that this section is inapplicable if "the disclosure . . . identif[ies] the title, description, or subject matter of any video tapes or other audio visual material"). This shows that, when Congress enacted the VPPA, an individual's "contact information" was not considered to be a particularly valuable interest, leading the Court conclude that "contact information" was not sufficiently important to constitute an equivalent to monetary consideration. Therefore, because Plaintiff only provided "contact information" as consideration—which is not "money or its equivalent"—for Defendants' newsletter, the Court holds that Plaintiff is not a "subscriber" within the meaning of the VPPA.

The Court also concludes that, even if merely exchanging personal information *could* constitute an equivalent to the monetary consideration required to form a "subscription," Plaintiff has not alleged facts indicating that is the case here. Plaintiff does not explain how giving his personal contact information to Defendants benefitted Defendants in any way to constitute consideration. Plaintiff does not allege, for example, that Defendants ever used Plaintiff's personal contact information to solicit donations or advertise merchandise. To the contrary, it appears that

Plaintiff "is free to [unsubscribe] without consequences whenever he likes, and never access [the newsletter] content again." *Ellis*, 803 F.3d at 1257. The Court is satisfied that the Plaintiff's provision of "contact information" was not the equivalent of monetary consideration.

Alternatively, the Court holds that even if the lessened standard adopted by the Eleventh Circuit were to apply, Plaintiff would not qualify as a "subscriber." The present case is similar to *Ellis*, where the Eleventh Circuit found the plaintiff was not a subscriber due to the limited nature of his "commitment, relationship, or association (financial or otherwise)" (a noticeably more lenient test than the one applied herein) with the VTSP, observing:

> Mr. Ellis did not sign up for or establish an account with Cartoon Network, did not provide any personal information to Cartoon Network, did not make any payments to Cartoon Network for use of the CN app, did not become a registered user of Cartoon Network or the CN app, did not receive a Cartoon Network ID, did not establish a Cartoon Network profile, did not sign up for any periodic services or transmissions, and did not make any commitment or establish any relationship that would allow him to have access to exclusive or restricted content. Mr. Ellis simply watched video clips on the CN app, which he downloaded onto his Android smartphone for free. In our view, downloading an app for free and using it to view content at no cost is not enough to make a user of the app a "subscriber" under the VPPA, as there is no ongoing commitment or relationship between the user and the entity which owns and operates the app. Importantly, such a user is free to delete the app without consequences whenever he likes, and never access its content again. The downloading of an app, we think, is the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content. Under the circumstances, Mr. Ellis was not a "subscriber" of Cartoon Network or its CN app.

*Ellis*, 803 F.3d at 1257.

Like in *Ellis*, Plaintiff Peterson does not allege that he made any payments to the Team Website, nor that he became a registered user of the Team Website, nor that he established a Team Website profile, nor that he had access to any exclusive or restricted content. *See id.* One difference between *Ellis* and the present case is that Plaintiff Peterson "sign[ed] up for [ ] periodic services or transmissions" in the form of the email update newsletters, whereas the *Ellis* plaintiff accessed

35

videos on the CN app at his own convenience. *Id.* However, Plaintiff Peterson does not allege that the newsletters contained embedded videos that he watched—at most, Plaintiff Peterson interacted with links to videos on the Team Website contained within the newsletters, like the plaintiff in *Ellis*, at his own convenience. Another difference is that Plaintiff Peterson can be considered to have "registered" for the newsletters, but the Court sees no significant difference between "registering" an account by entering contact information and downloading an app to a device; if anything, dedicating memory space on a device to an app seems to be a greater "commitment" than signing up for emails. *Id.* Thus, the Court concludes that the relationship between Plaintiff Peterson and Defendants is sufficiently similar to the relationship between the "subscriber" and the provider in *Ellis*, where the Eleventh Circuit found the plaintiff was not a "subscriber." *Id.* at 1256. Specifically, Plaintiff Peterson's use of the newsletter is more like "the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content," than it is to being a "subscriber." *Id.*; *see also* Filing 49-1 (providing a copy of *Edwards v. Learfield Commc'ns, LLC*, No. 1:23-cv-65 (N.D. Fla. October 6, 2023), where a court granted a 12(b)(6) motion to dismiss VPPA claims against Defendants Learfield and Sidearm Sports on similar facts, stating, "Just as downloading a free app did not create a subscription in *Ellis* . . . Plaintiffs' signing up for email updates here did not make them 'subscribers.' Signing up requires no 'durable' commitment or real exchange at all." (quoting *Austin- Spearman*, 98 F. Supp. 3d at 669)). Therefore, as an alternative holding, even under the more lenient test in *Ellis*, Plaintiff is not a "subscriber" within the meaning of the VPPA.[8]

---

[8] The Court concedes that under the First Circuit's test in *Yershov*, where providing personal information constitutes the consideration required to form a subscription, Plaintiff would be considered a "consumer" within the meaning of the VPPA. However, for the reasons explained above, the Court rejects the *Yershov* court's reasoning.

Because the Court concludes that Plaintiff is not a "consumer" within the meaning of the VPPA, the Court need not consider whether the information allegedly conveyed to Facebook was "personally identifiable information" or whether Defendants are "video tape service provider[s]." 18 U.S.C. § 2710(b). Because Plaintiff is not a "consumer," Plaintiff's Complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Far E. Aluminium Works Co.*, 27 F.4th at 1364. Therefore, Plaintiff has failed to state a claim under the VPPA, and Defendants are entitled to dismissal pursuant to Rule 12(b)(6).

### e. The VPPA Is Not Fit to Address Data Privacy Issues Stemming from Free Online Video Streaming

The Court is aware that data privacy is a sensitive issue and that the VPPA was enacted to protect this privacy. Nevertheless, because the Court must "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute," *Wis. Cent. Ltd*, 138 S. Ct. at 2070, the Court is not permitted to contort old law to fit new circumstances. This case illustrates the uncomfortable fit of the VPPA to free video streaming services: If Plaintiff accessed free videos on the Team Website by simply typing "huskers.com" into his web browser, he would undoubtedly not be a "renter, purchaser, or subscriber of goods or services," meaning he and members of his class would have no VPPA claim for having his PII allegedly disclosed to Facebook. However, because Plaintiff "subscribes" (in a modern sense unforeseen by the statute) to a free newsletter that contains links to these free videos, which anyone can freely access on the Team Website without first subscribing to the newsletter, Plaintiff argues that he and all other newsletter subscribers are entitled to relief under the VPPA, including not less than $2,500 in liquidated damages to each class member and injunctive relief. This argument fails not only as a matter of statutory interpretation but also as a matter of common sense. Absent any federal statute

prohibiting the sharing of personal identifying information with Facebook, plaintiffs should seek protection through the ordinary legislative process rather than through the courts.

## IV. CONCLUSION

For these reasons, the Court grants Defendants' Motion to Dismiss. The Court has subject matter jurisdiction over the claims because Defendants are not entitled to sovereign immunity. The Court also declines to dismiss the claim pursuant to Rule 12(b)(7) because Plaintiff did not fail to join a necessary party. However, the Court grants Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) because Plaintiff is not a "consumer" and therefore failed to state a claim under the VPPA.

IT IS ORDERED that Defendants' Motion to Dismiss, Filing 37, is granted.

Dated this 8th day of December, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge